FILED
00 JUN 28 AH ...
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUN 28 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| FELICIA HEREFORD-KAIGLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NUMBER |
| v. ) | |
| ) | 97-C-1516-NE |
| TOGO D. WEST, in his official capacity as ) | |
| Secretary of The Department of the Army, and ) | |
| U.S. Army, and U.S. ARMY MISSILE ) | |
| COMMAND-REDSTONE ARSENAL, a ) | |
| federal government entity, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

On April 29, 1997, plaintiff Felicia Hereford-Kaigler brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e et seq, alleging retaliatory discharge by her employer. Pending before the Court is defendant's Motion to Dismiss or in the Alternative for Summary Judgment. Upon careful consideration of all submitted materials, the Court concludes that Defendant is entitled to summary judgment based on the undisputed facts as a matter of law.

### I. BACKGROUND

Felicia Hereford-Kaigler is a black female who was employed by defendant at Redstone Arsenal from 1980 to October 1995. From 1983 to January 1985, plaintiff worked

1

in the Inertial Guidance Systems Branch. Dr. Paul Ruffin (black) was her first level supervisor and Charles Sliz (white) was her second level supervisor. Kaigler Dep., Def. Ex., "DX" 1 at 28-29.

In November 1994, plaintiff noticed in Charles Sliz's office a display of salt and pepper shakers that portrayed Aunt Jemima and Miss Luzianne, which she calls "mammy dolls." Plaintiff reasonably found these dolls offensive. She complained to her immediate supervisor, Ruffin. A meeting was arranged with plaintiff, Sliz, Ruffin, and Jerry Schieman, the Acting Director of Guidance Control Directorate. At that meeting, plaintiff expressed her offense concerning the racist nature of the dolls. Approximately one week later, Scheiman called plaintiff into his office and apologized to her regarding the mammy dolls. He assured her that the dolls were removed from Sliz's office. Complaint ¶ 8; DX 1 at 69-71, 76; Ruffin Dep., DX 3 at 44, 47-49; Memo from Ruffin, Nov. 21, 1995, DX 13; Schieman Dep., Pl. Ex. "PX" 4 at 24-26.

In January 1995, the plaintiff's department was reorganized. Plaintiff and her program were transferred to the Radio Frequency Branch. Emmons Dep., DX 4 at 7-9; DX 1 at 26-27, 35. As this was only an organizational change, plaintiff's job title, pay, and responsibilities remained the same. Powell Dep., DX 5 at 34-36. In her new position, she was supervised by Dr. George Emmons. Her second level supervisor was obstensibly Dr. Rex Powell. DX 4 at 7-9; DX 5 at 8-10. However, the plaintiff maintains that her second level supervisors were Charles Sliz and Tracy Jackson, and Powell was actually her third level supervisor. DX 1 at 29-30; Transcript of MSPB Hearing, DX 6 at 144-147. Ruffin

informed plaintiff that Schieman told Emmons, "I hope that you can do a better job of keeping up with her." PX 4 at 38; DX 4. at 22; PX 10. Emmons told the plaintiff that he did not envision her staying in the organization because "there are no opportunities." However, her predecessor David Jones, had attained a GS 15 level in the program.

Sometime between February 1995 and May 1995, the offensive dolls reappeared in Sliz's office. Plaintiff proceeded to complain to the Equal Employment Opportunity (EEO) office and management, including Powell; Emmons; Dr. Paul Jacob's, Deputy Director of Research and Development; Dr. William McCorkle, Director of Research and Development; Ernie Young, the second in command of the U.S. Army Missile Command; and Deputy Director Colonel Watts. She sought removal of the dolls and a transfer out of Sliz's department. DX 1 at 33-34, 43-50; DX 3 at 54; DX 4 at 14, 39; DX 6 at 40; PX 8.

On May 18, 1995, plaintiff received verbal notification that her duties as technical lead/program manager would be given to Hammond Green. DX 3 at 70, 114-115. She was also told to relocate her office closer to Emmons and the people within her new branch, but farther away from her lab, which is unusual. DX 3 at 65-68.

From May 19, 1995 to June 12, 1995, the plaintiff was absent from work. Mem. from Emmons to the plaintiff, July 28, 1995, DX 7; DX 1 at 114-115. The plaintiff claims that she needed to mentally regroup from all the stressful events which had led up to her reassignment. DX 1 at 54, 126-27. She returned to work on June 13. DX 1 at 115. Although she had called in each week, Emmons requested both a doctor's excuse for her extended absence and a clearance to return to work from the Office of Occupational Health.

3

DX 4 at 18; DX 5 at 46; DX 1 at 115.

Redstone Arsenal's policy provides that after three days of absence, it is within a supervisor's discretion to request medical documentation. DX 4 at 19. Plaintiff was surprised by this request because prior to her complaints about the dolls, she had taken leave for pregnancies and returned to work without documentation. After four hours the plaintiff left work again until June 19, 1995. DX 1 at 115.

Pursuant to Emmons request, on June 19, 1995, the plaintiff presented Occupational Health with a note from her doctor releasing her to work, but not a doctor's excuse. DX 1 at 17; Bowick Dep., PX 9 at 10-12. Dr. Bowick, the chief medical physician of Occupational Health, determined that the plaintiff's note was acceptable, and gave her form SF-71, which is normally sufficient documentation for a supervisor. PX 9 at 12, 14-16.

However, Bowick has no authority to approve sick leave. PX at 29.

By the time that the plaintiff reported to work, she misplaced the SF-71 and failed to produce it for Emmons. DX 1 at 117. Later that same day, while packing her belongings for her relocation, the plaintiff fell and sustained a back injury and left work. She never returned. DX 1 at 122, 128-129.

On June 20, 1995, Dr. Emmons sent plaintiff a memorandum requiring her to provide medical documentation justifying her absence from work from May 19, 1995 through June 9, 1995, and June 12, 1995 through June 16, 1995. He advised plaintiff that if the documentation was not produced she would be considered absent without leave (AWOL) for the specified periods. DX 1, Sub-Exhibit 1, Memorandum from Dr. Emmons, June 20,

4

1995 at ¶ ¶ 4 & 5. Plaintiff admits that she received this memorandum. DX 1 at 122-23.

On July 6, 1995, Dr. Emmons sent plaintiff a second memorandum requiring her to provide medical justification for her absences from work and advising her that as of July 6, 1995, he had changed her sick leave status to AWOL for the period May 19, 1995 and June 16, 1995. DX 1, Sub-Exhibit 1, Memorandum from Dr. Emmons, July 6, 1995. Plaintiff admits that she also received this memorandum. DX 1 at 123.

On July 10, 1995, the plaintiff contacted the EEO office to complain that her job responsibilities had been reduced due to race and gender discrimination. Informal EEO Complaint, Def. Ex. 15; Complaint at ¶ 10. She did not mention the salt and pepper shakers.

On July 28, 1995, Dr. Emmons sent plaintiff a third memorandum renewing his request for medical documentation excusing her absence from work. DX 1, Sub-Exhibit 1, Memorandum from Dr. Emmons, July 28, 1995; DX 7. Again, plaintiff admits that she received this memorandum. DX 1 at 123.

On August 25, 1995, the plaintiff sent a letter to Emmons responding to his request for medical documentation. However, plaintiff only provided Emmons with a release to work note that she had given to Occupational Health. DX1, Sub-Exhibit 4, Memorandum from Plaintiff, August 25, 1995 at ¶ 2. On August 30, 1995, the documentation still had not been produced. On that date, Emmons sent a memo to the Civilian Personnel Office requesting a notice of proposed removal. DX 10.

The plaintiff admits that she never obtained a note from her doctor explaining her absence from work. At her deposition, she testified that she "was never asked" to provide

medical documentation explaining her absence from the workplace, and she "[didn't] know exactly what constitute[d] a medical document." DX 1 at 118-119. Plaintiff further testified that, while she had legal counsel during the administrative process, she "wasn't advised by that counsel" to obtain a medical excuse. Therefore, she believed that the SF 71, which was available in the Occupational Health office, and the doctor's note releasing her to work were sufficient. DX 1 118-19. She further stated that the first time she learned that the SF 71 was insufficient was when she was terminated. DX 1 at 118-22.

However, the plaintiff's counsel Joyce Glucksman, notified her in a letter dated February 16, 1996, that it is "exceedingly important that we have the medical documentation from Dr. Chapell and/or your psychiatrist that will justify the nature of your illness, how he determined the nature of your illness . . . and a statement that you were in fact **incapacitated** from work and the dates of incapacitation." The letter further advised plaintiff that production of medical documentation was the "only way the [plaintiff] would be able to prevail." Letter from Glucksman to plaintiff, DX. 8. (emphasis in original)

Powell testified that the plaintiff never produced a doctor's note; however, he was not aware that she had produced a note allowing her to return to work, and said "if Felicia had come in with -- on the 19th of June with this and brought it to our attention, you know, I don't think we'd probably be here today. But I've never seen that." DX 5 at 46, 75.

On September 12, 1995, during her final counseling EEO interview, the plaintiff reported the salt and pepper shakers for the first time. Nov. 28, 1995 Memo, DX 17.

On September 21, 1995, the notice of removal was sent to the plaintiff, giving her 15

6

days to respond. DX 11. The plaintiff admits that she received it, but she made no response. DX 6 at 138-140, 144; DX 4 at 81-82. On October 17, 1995, Powell approved the plaintiff's removal. DX 12. The plaintiff was removed on October 27, 1995. DX 2.

On November 27, 1995, the plaintiff appealed her removal to the Merit Systems Protection Board (MSPB). DX 21. On February 13, 1996, the administrative law judge (ALJ) dismissed the plaintiff's claims of discrimination finding no connection between her removal and the discrimination claims. DX 22.

On December 6, 1995, the plaintiff filed a formal administrative complaint of discrimination. DX 18 & 19. On January 25, 1996, the EEO office dismissed the plaintiff's EEO complaint regarding the salt and pepper shakers because it was untimely, and the plaintiff did not appeal the dismissal. Plaintiff was advised that she had 90 days to file a civil action. DX 19 & 20.

On April 12, 1996, the ALJ upheld the plaintiff's removal because she had failed to produce medical documentation excusing her absence from work and found that she had failed to establish that her removal was retaliatory. DX 21. The MSPB denied her petition for review on December 12, 1996. DX 23. On January 15, 1997, plaintiff appealed the MSPB decision to the Equal Employment Opportunity Commission (EEOC). On May 16, 1997, the EEOC upheld the MSPB decision finding that no unlawful discrimination or reprisal had occurred. DX 24.

On June 30, 1997, plaintiff filed this suit.

## II. LEGAL STANDARDS

The law governing summary judgment is well settled. Summary judgment is appropriate where the movant demonstrates that there is no genuine issue as to any material facts and that, based upon the undisputed facts, the movant is entitled to judgment as a matter of law. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Once the movant has met its burden of establishing the lack of a genuine issue as to any material facts, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of material fact. See Chanel, Inc. v. Italian Activewear, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991). The court must view the facts in a light favorable to the non-moving party.

Title VII, 42 U.S.C. § 2000e prohibits reprisal against persons who participate in protected proceedings under the Act. A prima facie case of retaliation consists of evidence that (1) the plaintiff engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. Little v. United Tech., 103 F.3d 956, 959 (11th Cir. 1997).

Establishing a prima facie case of discrimination creates a presumption that the employer unlawfully discriminated against the employee. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). This presumption shifts the burden to the defendant to state a legitimate, nondiscriminatory reason for the adverse employment. See id. When the defendant articulates a legitimate, nondiscriminatory reason for its decisions, the

presumption is eliminated, and the plaintiff bears the burden of persuasion that the defendant's proffered reasons are a mere pretext for discrimination. See id.

Summary judgment is appropriate in discrimination cases where the evidence is insufficient to establish a prima facie case, see Holifield v. Reno, 115 F.3d 1555, 1563-64 (11th Cir. 1997), or when the plaintiff establishes a prima facie case, but cannot establish pretext sufficient to rebut the employer's legitimate nondiscriminatory reasons for its actions, see Grigsby v. Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir. 1987).

### III. DISCUSSION

After reviewing the entire record and construing the facts in favor of plaintiff, this Court finds there are no genuine issues of material fact and that defendant is entitled to summary judgment as a matter of law.

As a preliminary matter, plaintiff's claims against the U.S. Army Missile Command at Redstone Arsenal should be dismissed, and the current Secretary of the Army should be substituted for Togo West. Additionally, plaintiff's punitive damage claim must be dismissed, as a matter of law, because Section 102 of the Civil Rights Act of 1991 explicitly excludes the government from liability for such damages.

Plaintiff's complaint does not state a separate claim for disparate treatment, and no facts are alleged which would support such a claim. All that remains is plaintiff's claim for retaliation based primarily on her termination. Plaintiff alleges that she was improperly removed from the federal service because she filed an EEO complaint regarding the salt and pepper shaker display in Sliz's office.

Plaintiff has sufficient evidence to establish a prima facie case of retaliation. Defendant, however, has articulated a legitimate non-discriminatory reason for plaintiff's termination and the burden shifted back to plaintiff to prove pretext.

Plaintiff cannot prove that defendant's asserted reason is pretext for discrimination. She has no evidence that another employee who was absent for a similar length of time–other than her own pregnancies–was accepted back to work with only a release to work rather than a medical excuse for the leave.

By her own admission, plaintiff admits that she never fully complied with her supervisor's request for medical documentation explaining her absence from work when she had ample opportunity to produce the documentation. Plaintiff also provided no response or rebuttal to the letter of proposed termination.

Faced with an employee who was absent without leave for an extended period of time, who repeatedly failed to provide medical documents excusing that absence, and who provided no response to the letter proposing her removal, defendant had no option but to remove plaintiff. Both the Merit Systems Protection Board and the Equal Employment Opportunity Commission upheld the removal. Plaintiff cannot refute defendant's legitimate nondiscriminatory reasons for her removal and summary judgment for defendant is appropriate.

## CONCLUSION

Based on the foregoing, there being no disputable issue of fact, the defendant's Motion for Summary Judgment will be granted by separate order.

DONE this 27th day of June 2000.

_____
United States District Judge
U. W. Clemon

11